IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 9, 2020

**STEPHEN GERARD SMITH v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Franklin County**
**No. 20336   J. Curtis Smith, Judge**

_____

**No. M2020-00559-CCA-R3-PC**

_____

The Petitioner, Stephen Gerard Smith, was convicted by a jury of aggravated assault, attempted aggravated assault, and three counts of domestic assault for offenses committed against his wife, and he received an effective twenty-five-year sentence. He sought and was denied post-conviction relief based on numerous allegations of ineffective assistance of counsel. On appeal, he alleges that he received ineffective assistance when trial counsel: (1) gave deficient advice regarding a plea offer; (2) failed to challenge a prospective juror; (3) argued in closing argument that the Petitioner was guilty of the misdemeanor offenses; (4) failed to object to testimony referring to the Petitioner's prior incarceration; (5) failed to object to the prosecutor's comment on the victim's credibility; (6) failed to call witnesses; and (7) failed to interview witnesses. Because we conclude that the Petitioner has not established either deficiency or prejudice for each claim, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Joseph E. Ford, Winchester, Tennessee, for the appellant, Stephen Gerard Smith.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Mike Taylor, District Attorney General; and Courtney Lynch, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Petitioner seeks post-conviction relief, asserting ineffective assistance of counsel. We summarize the facts underlying the Petitioner's convictions as they are pertinent to his post-conviction claims.

### Trial

The Petitioner was charged with three counts of aggravated assault by the use of a deadly weapon against the victim, his wife, after he threatened her with a spindle, threatened her with a hot skillet, and threatened her with a bow and arrow. He was simultaneously charged with three counts of domestic assault against the victim for hitting her, kicking her, and throwing a sippy cup at her, causing bruises. A fourth count of domestic assault, in which the victim was the Petitioner's two-year-old daughter, was dismissed prior to trial. The State introduced proof that the Petitioner assaulted the victim numerous times over the course of days. The Petitioner sought to show that the victim had only reported the assault at the behest of her employer, that the victim had delayed reporting, and that she had attempted to reconcile with the Petitioner.

At trial, the victim, who was employed at a salon, testified that she and the Petitioner had gone to Nashville on March 25, 2012, in order to allow her to attend a "hair show" for professional development. The victim and Petitioner met some acquaintances in the elevator as they were leaving. On the return trip, the victim refused to perform oral sex on the Petitioner as he drove, and he became irate, stopping the car and ordering her out. The Petitioner opened the trunk and told her to get inside. As he did so, a vehicle with the acquaintances whom they had seen in Nashville began to pull over, and the Petitioner told the victim to get back in the car. The victim got in the passenger's seat, and the Petitioner drove home at 110 miles per hour, arguing with her.

Ms. Wanda Finney, a hairdresser, testified that she did not have a personal relationship with either the victim or the Petitioner, and she confirmed that she had seen the Petitioner and the victim on an elevator in Nashville, where the victim appeared to have been crying. She then recognized their car with the trunk open on the side of the road and began to pull over, but she assumed they were changing a tire and did not stop. The Petitioner later passed Ms. Finney's car, driving at an excessive speed. Ms. Jennifer Ingle, who likewise did not have a personal relationship with either party, was riding with Ms. Finney and also confirmed that she had seen the vehicle stopped on the road.

The victim did not go to work the next day, Monday, but went to work on Tuesday, March 27, 2012. Her last client of the day arrived late to his appointment, and the Petitioner called her shortly before 5:00 p.m. to tell her that if she were not home in ten minutes, "you know what it is." The Petitioner began to assault the victim as soon as she arrived home, spitting on her, grabbing her neck, and putting her face by the porch rail. The victim got into the car with the Petitioner to pick up their child from her mother's home, but instead, the Petitioner began driving dangerously down "back roads," calling his friends to ask them what he should do about his "cheating wife" and continually poking her in the side of her head.

The Petitioner ultimately drove her to the beauty salon where she worked. He instructed her to enter the salon, make contact with no one, and to come to the car with the metal spindle that held her receipts. Due to an inaccurate setting on the credit card machine, her last receipt reflected a time of 3:44 p.m. instead of 4:44 p.m. The Petitioner held the spindle to her neck and said, "I ought to kill you right here right now you lying b*tch." The victim was afraid he would follow through on his threat. He then jabbed the spindle into the dashboard of the car. The State introduced a photograph of the hole left by the spindle.

The Petitioner drove the victim to her mother's house to pick up the couple's daughter. He did not allow her to get out of the car or talk to her mother but "tossed" the child inside the vehicle. The victim's mother confirmed that the Petitioner picked up the child and testified that he told her that he was going to tie up the victim. The victim's mother believed this was a "joke." When the Petitioner took the child to the car, the victim's mother saw the victim and inferred that something was wrong, but she thought that the two had been arguing verbally and did not intervene.

At the home, the Petitioner forced the victim to cook in her underclothes. As the victim was heating the skillet, the Petitioner kicked her in her right buttock, leaving a bruise. He then picked up the hot skillet and held it to her face so that she could feel the heat radiating off of it. He told her that no other man would love her and that if another man did, "they'd have to look at a burnt face the rest of their life." The victim was afraid.

The Petitioner briefly left, taking the victim's car keys and cell phone. The victim ate dinner with her daughter. The Petitioner returned, again accused the victim of being unfaithful, and poked her in her forehead repeatedly, causing a bruise. The Petitioner instructed the child to call the victim a vulgar name, and he poured beer on the victim. The child left the room, and the Petitioner threw a sippy cup at the victim, resulting in a bruise on her arm. The Petitioner then grabbed a bow and arrows and began hitting the couch and coffee table with them. He threatened to "whoop" the victim with them, and she was afraid. However, he did not use the bow and arrows to physically assault her.

The Petitioner again accused the victim of being unfaithful, alleging that she was involved with the client whose hair she had cut prior to leaving work. The Petitioner called the victim's client, who testified that he had no social relationship with the victim and that the Petitioner called him and threatened to kill him sometime after midnight. At the marital home, the Petitioner then pretended to be the client and simulated intercourse with the victim, hitting her repeatedly on the hip with his fist and leaving a bruise.

The Petitioner left early in the morning with Mr. Shawn Pickett, who came to the house. The Petitioner instructed the victim not to let anyone into the house or answer the door. The victim slept all the next day. The victim's mother came to see the victim, but the victim said she was ill, and the victim's mother never saw the victim's face.

Ms. Heather Jones, who was the victim's employer, came to the victim's house on the following day, Thursday. She testified that she intended to fire the victim because the victim had missed two days of work and because she had had to call the Petitioner to discover that the victim was sick. Eventually, the victim's child answered the door and ran out. When the victim came after her child, Ms. Jones could see "bruises all over her." Ms. Jones asked if the Petitioner was responsible and inferred from the victim's response that he was. She offered to help the victim and told the victim that the victim was responsible for protecting her child from witnessing assault.

The victim testified that on Saturday, the victim and the Petitioner attended a child's birthday party with their daughter. The victim testified she was still bruised at the time. Driving back, the Petitioner pulled in front of the police station, hit her in the back of the head, and told her that she could scream and no one would help her. On Sunday, the victim went to church and dinner with the Petitioner's parents. On Monday, the Petitioner left home and left the victim's keys on the counter for her to use. The victim went to the salon where she worked and there decided to flee her home. She returned only to retrieve her daughter, who was in the care of the victim's aunt, and a basket of personal items. The Petitioner's mother had arrived at the home, and she gave the victim money. The Petitioner's mother agreed that she had given the victim money and that she saw a bruise on the victim's arm at the time.

Ms. Jones confirmed that the victim came by the salon briefly and returned with her child and some personal possessions. Ms. Jones offered to help the victim but made her promise she was "serious" because Ms. Jones did not want to be "in the middle of this back and forth." The victim stayed with Ms. Jones for two days, and Ms. Jones took photographs of the bruises on her forehead, arm, buttock, and hip. These photographs were introduced at trial. She agreed that she called the police and that they came to her home while the victim was there. Ms. Jones assisted the victim in leaving the county.

She denied ever threatening to withhold her support if the victim refused to report the charges, and she did not tell the victim to exaggerate the offenses. She also denied threatening to call the Department of Children's Services if the victim did not report the assaults. She was not aware that the victim had attempted to reconcile with the Petitioner, but she stated she would not have fired the victim if the victim had told her about the attempted reconciliation.

The victim testified that Officer Curtis Francis and another officer came to Ms. Jones's house while the victim was staying there. The victim filed for an order of protection on April 3, 2012. The victim filled out an affidavit as part of this form. In a column labeled "weapons used," she listed a sippy cup, beer can, magazine, and shoes. She agreed did not mention the spindle, skillet, or bow and arrows but stated that she was frightened the entire time that the Petitioner would see her car at the station and only wrote down the things she could remember "without hesitation." She filled out an affidavit on April 24, 2012, prior to the hearing on the order of protection, and that affidavit contained the details she had included in her trial testimony. The victim acknowledged that she suffered no injury from the spindle, frying pan, or bow and arrows.

The victim left town dressed as a man to avoid being recognized. She testified that when she returned to town for the hearing on the order of protection, she parked at a restaurant, and her vehicle was missing within a matter of minutes. Asked by trial counsel if her car had been a gift from the Petitioner's family, she replied, "Actually, I want to say that I gave his mother, I think, they told me I could buy the car for $300, but it was my, pretty much gift for graduating beauty school while he was incarcerated." Trial counsel did not object to this statement.

The victim and the Petitioner's mother and father all testified that the victim had attempted to reconcile with the Petitioner in the months preceding trial and that she had parked her car at the Petitioner's parents' home during her visits to the Petitioner. Ms. Karen James, who lived with the Petitioner's uncle, also testified that the victim had attempted to reconcile with the Petitioner and had hidden her car at the Petitioner's uncle's home. According to Ms. James, the victim said that if Ms. Jones caught her with the Petitioner, Ms. Jones would fire the victim and report her to "DHS." The victim denied having said to Ms. James that she invented the allegations because Ms. Jones forced her to do so. She also denied stating to Mr. Justin Partin or Ms. Jennifer Thompson that she was pressured by Ms. Jones to "come up with these things."

Ms. Jenny Armstrong, a victim advocate at "Haven of Hope," testified regarding her observation of the civil hearing on the order of protection. Trial counsel objected to her testimony, and after an offer of proof outside the presence of the jury, the trial court

determined that her testimony was admissible as an admission against interest made by the Petitioner. Ms. Armstrong testified that at the hearing, the Petitioner "was asked if he assaulted [the victim], and he said yes" and "shook his head." She agreed that the allegations in the order did not include the use of a spindle, skillet, or bow and arrow. The victim likewise testified at trial that, during the hearing on the order of protection, the Petitioner "didn't deny it, and the order of protection was granted."

The jury convicted the Petitioner of aggravated assault for causing the victim to reasonably fear imminent bodily injury by the use of the spindle. *See* T.C.A. § 39-13-102(a)(1)(A)(iii). The Petitioner was convicted of the lesser included offenses of attempted aggravated assault for causing the victim to reasonably fear imminent bodily injury by the use of the skillet. *See id.*; T.C.A. § 39-12-101. He was acquitted of the count of aggravated assault premised on the use of the bow and arrows. He was convicted of three counts of misdemeanor domestic assault by bodily injury. *See* T.C.A. §§ 39-13-101(a)(1), -111(b).

The record from direct appeal reflects that the Petitioner had pending felony and misdemeanor charges in Grundy County, including an aggravated burglary and a Class D vandalism charge.[1] The Petitioner waived venue and entered into a plea agreement with the State whereby he was to plead guilty to the pending Grundy County felony charges in exchange for agreed-upon sentences in those cases and in the Franklin County jury convictions. For the jury convictions, the Petitioner was sentenced to fifteen years as a career offender for aggravated assault, twelve years as a career offender for attempted aggravated assault, and eleven months, twenty-nine days for each of the three domestic assaults. In addition, the Petitioner was to be sentenced to twelve years as a career offender for Class D felony vandalism and to fifteen years as a career offender for aggravated burglary. All of the sentences were to be served concurrently.

After the entry of judgments, the Petitioner filed a pro se Motion for Reduction of Sentence under Tennessee Rule of Criminal Procedure 35. *State v. Stephen Gerard Smith*, No. M2015-00261-CCA-R3-CD, 2016 WL 6541838, at *1 (Tenn. Crim. App. Nov. 4, 2016), *perm. app. denied* (Tenn. Mar. 8, 2017). The trial court held a hearing on the motion. During the hearing, trial counsel acknowledged that he had incorrectly advised the Petitioner regarding his Range on the Class C aggravated assault. Trial counsel had told the Petitioner that he was a career offender subject to a fifteen-year sentence on the Class C felony, when the Petitioner was actually a persistent offender, subject to a ten- to fifteen-year sentence. Trial counsel noted that he was attempting to prevent consecutive sentencing, particularly because there was an allegation that the

---

[1] According to the prosecutor's statement at sentencing, Ms. Jones and her husband were the victims in one of these cases.

vandalism and aggravated burglary were committed while the Petitioner was released on bond. The trial court informed the Petitioner that he would "run the risk of getting somewhere between [ten] and [fifteen] years on the one that you're convicted [of] and then going to trial and getting those stacked on top of those." *Id.* The Petitioner responded, "Yes, sir." *Id.* The trial court concluded that it must vacate the entire plea agreement, including not only the sentences in the case with the jury trial but the Grundy County guilty pleas. *Id.* at *2. Represented by new counsel at a new sentencing hearing, the Petitioner received a thirteen-year sentence as a persistent offender for the aggravated assault and a twelve-year sentence as a career offender for the attempted aggravated assault. *Id.* at *3. The trial court ordered these to be served consecutively to one another but concurrently with his three misdemeanor domestic assault convictions for an effective twenty-five-year sentence. *Id.* On appeal, the Petitioner challenged the trial court's procedure in the hearing on his pro se motion for reduction of a sentence, and he challenged the length of the sentences imposed. *Id.* at *1. This court denied relief, and the Tennessee Supreme Court denied permission to appeal. *Id.*

## Post-conviction Proceedings

On February 26, 2018, the Petitioner filed a timely post-conviction petition, asserting various instances of ineffective assistance of counsel and other grounds for relief. He was appointed counsel and filed an amended petition for post-conviction relief. The grounds relevant to appeal included the following allegations: (1) that the Petitioner rejected a plea offer of eleven months and twenty-nine days based on inaccurate advice from counsel; (2) that trial counsel failed to take action when a juror revealed that she had been on a previous jury where the Petitioner was the defendant; (3) that trial counsel, without consulting the Petitioner, argued to the jury that he was guilty of the misdemeanor offenses charged; (4) that trial counsel was deficient in failing to object to the victim's testimony referring to the Petitioner's prior incarceration; (5) that trial counsel failed to object to a statement by the prosecutor which vouched for the victim's testimony; (6) that trial counsel had been deficient in failing to call Mr. Partin and Ms. Thompson to rebut the victim's testimony that she never asserted Ms. Jones forced her to make the allegations; and (7) that trial counsel failed to call Mr. Pickett or Officer Francis as witnesses and that trial counsel did not challenge the admissibility of Ms. Armstrong's and Ms. Finney's testimony.

The Petitioner and his trial counsel testified at the hearing and agreed that trial counsel was hired to represent the Petitioner in general sessions court, where the Petitioner was charged only with domestic assault and given a plea offer of eleven months and twenty-nine days in jail. After the Petitioner refused the plea offer and waived his preliminary hearing, he was charged in circuit court with three counts of aggravated assault committed against his wife, three counts of domestic assault

- 7 -

committed against his wife, and one count of domestic assault committed against his child. The Petitioner was briefly represented by the public defender's office, but due to a conflict, trial counsel was appointed to the case.

According to the Petitioner, the prosecutor's initial plea offer was the maximum sentence for the single count of domestic assault with which he was charged in general sessions court. The Petitioner testified that trial counsel advised him to waive his preliminary hearing and proceed to trial because the State's plea offer was already the maximum sentence. According to the Petitioner, trial counsel never stated that the charges could be increased, and if he had known that he could face additional charges, he would have taken the initial plea offer. The Petitioner testified that in circuit court, trial counsel did not discuss the case with him except to relay plea offers by the State. He agreed on cross-examination that the plea offer was increased from eleven months and twenty-nine days to six years when the case was moved to circuit court. He questioned whether "everybody in Franklin County that threatens their spouse with the threatened use of a deadly weapon" would be charged with aggravated assault.

Trial counsel denied having told Petitioner that the misdemeanor sentence was the most he could receive, noting that he knew at the time that the prosecutor had threatened to charge the Petitioner with aggravated assault. Trial counsel in particular recalled that, as he was speaking with the Petitioner and the Petitioner's friend in the general sessions courtroom regarding the offer, the prosecutor walked past and told them that if the Petitioner did not accept the offer, the prosecutor would amend the charges. He did not recall the Petitioner's having consumed alcohol prior to this interaction. He testified that he did not inform the Petitioner of his potential sentencing exposure because he did not know the Petitioner's criminal history but told the Petitioner that a Range I sentence for aggravated assault would be three to six years. According to trial counsel, he relayed the State's initial plea offer to the Petitioner, but the Petitioner told him "he's not going to do 11/29" and "wasn't going to have it any other way." After the Petitioner waived the preliminary hearing, the prosecutor offered to resolve the offenses, along with pending aggravated burglary and a pending Class D vandalism charge, by offering a six-year concurrent sentence. Trial counsel testified he "begged" the Petitioner to accept the offer. The Petitioner, however, refused to consider any offers because of his blithe but mistaken confidence that the victim would not testify. After trial, the Petitioner agreed to waive venue and enter guilty pleas in his pending burglary and vandalism charges, resulting in a fifteen-year concurrent sentence for all offenses. Because the Petitioner was incorrectly classified as a career offender on the aggravated assault offense, he filed a Rule 35 motion to contest the judgments, and he ultimately received a twenty-five-year sentence.

Regarding trial counsel's performance at voir dire, the Petitioner testified that one of the jurors stated in front of the jury pool that she had been a juror on a prior "likewise case" in which the Petitioner was the defendant. The Petitioner believed she was on the 2008 jury in his trial for kidnapping. He testified that the juror did not sit on the jury but that trial counsel did not object or move for a mistrial. He agreed that the juror did not specify whether the trial was criminal or civil. He also agreed that while his recollection was that she said it was a "likewise jury," the transcript reflected that her response was "indiscernible." Trial counsel acknowledged that the juror said she had been on a jury where the Petitioner was the defendant and that this statement was made in front of the venire. Trial counsel acknowledged he did not object, stating he did not think the statement would taint the pool and he did not want to draw attention to it. He testified that the juror was not seated on the jury.

The transcript of voir dire shows that after some prospective jurors had been dismissed, the prosecutor asked if any of the new prospective jurors knew or had "had dealings with" the Petitioner. The juror volunteered, and the following exchange took place:

> [Prosecutor]: …. You have, okay. And what's that association?
>
> Juror: I just have trial jury [the Petitioner] – I couldn't I just (indiscernible) jury where [the Petitioner] was, I believe, the defendant.
>
> [Prosecutor]: So that answers the question that you had other jury experience as well. Would that experience affect you[r] ability to follow the law and the facts in this particular case and serve today?
>
> Juror: No.

After further discussion of other topics, more peremptory challenges were issued. The juror was excused through a peremptory challenge.

The Petitioner also testified that during closing argument, trial counsel said, "my client's guilty," paused fifteen seconds, then said "my client is not guilty of this." Trial counsel never discussed admitting guilt of the misdemeanor offenses to the jury as a trial strategy with the Petitioner, and the Petitioner testified he would not have agreed to admit guilt if he had been consulted. Asked if he had refrained from complaining about the strategy because he "understood that what [trial counsel] was trying to get the jury to do was to convict [the Petitioner] on the misdemeanors and not the felonies," he responded that trial counsel was attempting to fix trial counsel's mistake in advising the Petitioner to reject the plea offer in general sessions court. The Petitioner testified that he did not ever

communicate his disapproval of the strategy to trial counsel, either at trial or when trial counsel visited him in prison to discuss his pending Rule 35 motion.

Trial counsel acknowledged that he told the jury that the Petitioner was guilty of the domestic assault charges. Trial counsel explained that he had attempted to prepare for trial with the Petitioner but that the Petitioner refused to discuss any of the facts surrounding the offenses because he staunchly but incorrectly believed that the victim would not testify. Although trial counsel told the Petitioner that trial counsel had met with the victim and believed she would testify, the Petitioner was not swayed and refused to help trial counsel prepare for trial. Trial counsel testified that after hearing the trial testimony of the victim, whom he found credible, he decided to argue that the Petitioner was guilty of the lesser charges in order to attempt to secure acquittal on the aggravated assault charges. He acknowledged he never told the Petitioner that he intended to tell the jury that the Petitioner was guilty of some of the offenses, despite having the opportunity to do so.

During closing argument, defense counsel attempted to emphasize that no testimony connected the victim's injuries with any of the deadly weapons charged. He stated:

> Ladies and gentlemen, [the victim's] own testimony and from the other witnesses, this bruise was caused by his hand. Is [the Petitioner] guilty of domestic assault by hitting her in her hip, or that assault — that bruise in Exhibit No. 10? Absolutely. He's guilty of it. He shouldn't hit her. It's not appropriate. It shouldn't have been done. Is he guilty of domestic assault? Absolutely.

> This assault on Exhibit No. 8 on her face, remember the testimony where he took his finger and poked her in the side of the head and caused that bruise? Is that domestic [sic] assault? No, it's not. Is he guilty of domestic assault for poking her? Absolutely, but it's not aggravated assault, it's domestic assault. Should it have taken place? Absolutely not. It's uncalled for, but it's not aggravated assault.

> The bruise on her arm, No. 9, when he threw the sippy cup, it's not aggravated assault. It's not. Is he guilty of it? Absolutely. Not appropriate. Absolutely.

Trial counsel emphasized the victim's delay in reporting, the inconsistencies between her affidavits, and the victim's continued contact with the Petitioner. He concluded, "Is [the Petitioner] guilty of domestic assault? Absolutely. Is he guilty of aggravated assault?

Absolutely not. And ladies and gentlemen of the jury, I would ask you to come back with a not guilty verdict on the aggravated assault."

In rebuttal, the prosecutor noted that the Petitioner had not presented evidence questioning the occurrence of an assault. She observed, "In fact, you've heard admissions as to the domestic violence, admissions that the Defendant made in open court as well as you've just heard [trial counsel] admit that they happened." The prosecutor argued that these admissions bolstered the victim's testimony supporting the aggravated assault charges, noting other corroborating witnesses.

Regarding the victim's testimony revealing the Petitioner's incarceration, the Petitioner noted that the victim had testified that the Petitioner's father bought the victim a car while the Petition was incarcerated. Trial counsel did not object. Trial counsel agreed that he did not "pick up" on the victim's testimony referencing a prior incarceration. He did not object to the testimony.

The Petitioner asserted ineffective assistance in trial counsel's failure to object to the prosecutor's statement allegedly vouching for the victim's credibility. After the victim had acknowledged her attempted reconciliation with the Petitioner, the prosecutor asked her, "But you're testifying to the truth today, correct?" At the post-conviction hearing, trial counsel agreed that he did not object to this question.

Trial counsel stated that his strategy at trial was to introduce evidence that the victim had continued to have a relationship with the Petitioner after the assault. The theory of the defense was that Ms. Jones forced the victim to allege that the Petitioner assaulted her. At trial, the victim denied having said to Mr. Partin or Ms. Thompson that she was only reporting the offenses because of her employer. Trial counsel agreed he did not call either Mr. Partin or Ms. Thompson as a witness to rebut the victim's testimony. However, trial counsel noted that he believed he only learned about the witnesses on the day of trial because the Petitioner had not previously cooperated in preparing his own defense.

The Petitioner testified that he knew the State intended to call Ms. Finney to testify but that he did not know what her testimony would be. He stated that she ultimately testified that she saw the Petitioner trying to put his wife in the trunk. He asserted this action was not a charged offense. Ms. Armstrong testified that the Petitioner admitted to offenses against the victim at a hearing on an order of protection. The Petitioner denied admitting guilt but acknowledged that the court held a jury-out hearing regarding the admissibility of the testimony. The Petitioner also testified regarding witnesses who he thought would have been able to rebut the testimony regarding the victim's bruises. The Petitioner stated he had told trial counsel that Mr. Pickett came to

the house and would have seen any bruises that were visible on the victim. The Petitioner also noted that the victim had testified that Officer Francis came to the home where she was staying after she escaped the marital home. The Petitioner also testified that the birthday party attendees would have seen any bruises present, but he stated he did not tell trial counsel the names of the attendees.

Trial counsel did not recall discussing Mr. Pickett with the Petitioner. He knew Mr. Pickett was on the State's witness list, but the Petitioner never told trial counsel that Mr. Pickett's testimony would be favorable to the defense. Trial counsel acknowledged that he did not interview Mr. Pickett or Ms. Finney. He noted that Ms. Finney's testimony was brief and did not describe bad acts but only described seeing the car by the side of the road, which corroborated the victim's testimony. Mr. Pickett did not testify at trial. Trial counsel acknowledged he did not interview Officer Francis. He stated he believed that Officer Francis did not see the victim immediately after the crime, and he was uncertain if the victim's bruises would have been visible at the time Officer Francis saw her. He stated that the Petitioner first mentioned the birthday party on the day of trial.

The Petitioner's father, John Smith, Jr., testified at the post-conviction hearing that trial counsel did not discuss trial strategy but only plea offers with him. He did not recall if he attended the hearing on the order of protection.

The post-conviction court denied relief. The court credited trial counsel's testimony regarding the circumstances of the plea offer. It also concluded that trial counsel's failure to challenge the juror was not deficient or prejudicial because "further inquiry" would not have benefited the Petitioner and because a motion for a mistrial would not have been successful. The post-conviction court found that trial counsel's closing argument was a reasonable trial strategy in light of the strong evidence and was not prejudicial. The court declined to find prejudice from the failure to object to the testimony about the Petitioner's prior incarceration and concluded that the failure to object to the State's alleged comment on the victim's veracity was neither deficient nor prejudicial. The post-conviction court found that the Petitioner could not show prejudice in the failure to call witnesses because these witnesses, including Mr. Partin, Ms. Thompson, and the "witnesses to rebut the victim's testimony that the victim was still visibly bruised," did not testify at the post-conviction hearing. The Petitioner appeals.

## ANALYSIS

The Petitioner asserts that he is entitled to post-conviction relief because his Sixth Amendment right to counsel was violated by trial counsel's deficient performance. Under the Post-Conviction Procedure Act, a petitioner is entitled to relief when "the

conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witnesses, the weight and value of witness testimony, and the resolution of factual issues. *Id.* Questions of law and mixed questions of law and fact are reviewed de novo. *Id.* Each element of a claim of ineffective assistance of counsel is a mixed question of law and fact. *Id.*

Under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution, the accused is guaranteed the right to effective assistance of counsel. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). A petitioner must prove both that counsel's performance was deficient and that the deficient performance caused prejudice to the defense in order to prevail on a claim asserting ineffective assistance of counsel. *Kendrick*, 454 S.W.3d at 457 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Deficiency requires showing that counsel's errors were so serious "'that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014) (quoting *Strickland*, 466 U.S. at 687). To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). In evaluating counsel's performance, strategic decisions made after a thorough investigation "'are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with the presumption "that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland*, 466 U.S. at 694). The petitioner must show that the deficiency deprived him of a fair trial and called the reliability of the outcome of the proceeding into question. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). A claim may be denied for failure to establish either deficiency or prejudice, and the reviewing court need not address both components if a petitioner has failed to establish one. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## I. Plea Negotiations

The Petitioner asserts that trial counsel performed deficiently by not advising him that the State could amend the charges from one count of domestic assault to three counts of aggravated assault and three counts of domestic assault. He contends that trial counsel deficiently advised him to refuse the State's plea offer to serve eleven months and twenty-nine days for the offense for which he ultimately received a twenty-five-year sentence, and he argues that he would have accepted the plea offer had he been properly advised. We conclude that, based on the post-conviction court's factual findings, the Petitioner has not established deficiency or prejudice.

The Petitioner was initially charged with a single count of domestic assault and was given a plea offer of eleven months and twenty-nine days. He was ultimately convicted of aggravated assault, attempted aggravated assault, and three counts of domestic assault, and received a sentence of twenty-five years. The Petitioner asserted that trial counsel failed to advise him that he could be subject to a greater penalty if he refused the State's plea offer. Trial counsel, on the other hand, testified that the Petitioner adamantly refused to consider entering a guilty plea, relying on his mistaken perception that the victim would not testify. Trial counsel also testified that the prosecutor informed both him and the Petitioner that if the Petitioner refused the plea offer, he would be charged with aggravated assault. He stated that he advised the Petitioner that a Range I penalty for the offense would be three to six years but did not tell the Petitioner what his personal exposure was because he did not yet have access to the Petitioner's criminal history. The post-conviction court credited the testimony of trial counsel that he advised the Petitioner that he would be subject to a greater penalty if he refused the plea offer and that the Petitioner knew that the prosecutor intended to charge him with a felony offense if he refused the plea offer. We are bound by the post-conviction court's factual findings unless the evidence preponderates otherwise. *Kendrick*, 454 S.W.3d at 457. Accordingly, we conclude trial counsel did not perform

- 14 -

deficiently or prejudice the defense. The Petitioner is not entitled to relief based on this issue.

## II. Voir Dire

The Petitioner also asserts that trial counsel was deficient in failing to object or to move for a mistrial when a juror announced that she had previously served on a jury in a case where the Petitioner was the defendant. The State argues that trial counsel's decisions were strategic and entitled to deference. We conclude that the Petitioner cannot show prejudice and is not entitled to relief.

The transcript of voir dire shows that the juror was called after other jurors had been dismissed pursuant to peremptory challenges. The prosecutor asked the new prospective jurors if they knew or had "had dealings with" the Petitioner. The juror stated, "I just have trial jury [the Petitioner] – I couldn't I just (indiscernible) jury where [the Petitioner] was, I believe, the defendant." At the post-conviction hearing, the Petitioner asserted that the juror stated in front of the venire that she had been a juror on a "likewise case" in which the Petitioner was the defendant. While the Petitioner acknowledged that the juror did not specify that the prior trial was a criminal matter, he emphasized that she used the word "likewise" and speculated that the juror served on his prior trial on a kidnapping charge. Trial counsel agreed that the juror said she had been on a jury where the Petitioner was the defendant and that this statement was made in front of the venire. Trial counsel acknowledged he did not object, stating he did not think the statement would taint the pool and he did not want to draw attention to it. The transcript reveals that after further discussion of other topics, more peremptory challenges were issued, and the juror was excused pursuant to a peremptory challenge.

A defendant is entitled to a trial by an impartial jury, and jurors must "render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing U.S. Const. amend. VI; Tenn. Const. art. I § 9). "'[I]n the absence of proof to the contrary,'" we presume the jury is "'impartial and qualified.'" *State v. Michael Small*, No. W2009-00858-CCA-R3-CD, 2012 WL 1549832, at *8 (Tenn. Crim. App. May 2, 2012) (quoting *State v. Cooper*, 736 S.W.2d 125, 130 (Tenn. Crim. App. 1987)). "Generally, errors committed during the selection, summoning and empaneling of juries do not affect the validity of a verdict in a criminal case unless prejudice has enured to the accused." *State v. Reginald Merriweather*, No. W1999-02050-CCA-R3-CD, 2002 WL 1482742, at *8 (Tenn. Crim. App. Feb. 11, 2002) (citing *Helton v. State*, 255 S.W.2d 694, 700 (Tenn. 1953); *State v. Boyd*, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992); *State v. Elrod*, 721 S.W.2d 820, 822 (Tenn. Crim. App. 1986); *State v. Wiseman*, 643 S.W.2d 354, 359 (Tenn. Crim. App. 1982)). A comment from a prospective juror "is not grounds

for a mistrial absent evidence showing that the jury which heard the case was prejudiced or biased by the statements of the prospective juror." *State v. Brown*, 795 S.W.2d 689, 696 (Tenn. Crim. App. 1990); *see State v. Daniel T. Maupin*, No. M2016-01483-CCA-R3-CD, 2017 WL 4331053, at *3 (Tenn. Crim. App. Sept. 28, 2017).

We conclude that the Petitioner has not established prejudice with regard to this claim of ineffective assistance of counsel. While the trial counsel may have been able to successfully challenge the juror for cause, *see*, *e.g.*, *State v. Tavarus Detterio Griffin*, No. W2014-02114-CCA-R3-CD, 2015 WL 7833205, at *10 (Tenn. Crim. App. Dec. 3, 2015) (excusing a juror who had been in the venire when the defendant was initially tried); *Donavan Edward Daniel v. State*, No. W2003-02511-CCA-R3-PC, 2004 WL 2159004, at *7 (Tenn. Crim. App. Sept. 27, 2004) (prospective jurors familiar with the defendant were excused), the juror ultimately was not seated on the jury. *See State v. Javoris Sparkman*, No. M2010-01521-CCA-R3-CD, 2012 WL 1799024, at *11 (Tenn. Crim. App. May 18, 2012) ("Regardless of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial."). The juror's statement was brief, not entirely coherent, and partially indiscernible to the court reporter.

Ultimately, the Petitioner has presented no proof that the jury that actually sat in judgment of him was not fair and impartial. Accordingly, he has not established prejudice from trial counsel's alleged deficiency. *See State v. Harries*, 657 S.W.2d 414, 419 (Tenn. 1983) (prospective juror's comment that she had heard on the news that the defendant used drugs and was a habitual criminal was not grounds for relief); *Brown*, 795 S.W.2d at 696 (the defendants failed to show that the actual jury was biased when a prospective juror indicated he had damaging information regarding the defendants from an acquaintance who was familiar with the crime); *Michael Small*, 2012 WL 1549832, at *8 (concluding that the defendant had failed to show that a potential juror's declaration that the defendant was "freaking [her] out" affected the impartiality of other jurors); *State v. Christopher K. Knight*, No. W2001-02995-CCA-R3-CD, 2003 WL 721701, at *1 (Tenn. Crim. App. Feb. 27, 2003) (the jury pool was not tainted when a prospective juror revealed that he was acquainted with the defendant through his work on the disciplinary committee of a school where the defendant was a student); *Reginald Merriweather*, 2002 WL 1482742, at *8 (concluding that that the defendant had failed to show prejudice from a prospective juror's remark in front of the venire that he had met the defendant previously and could not be fair due to the circumstances under which they met). We conclude that the Petitioner is not entitled to relief on this issue.

### III. Admission of Guilt in Closing Argument

The Petitioner next challenges trial counsel's choice to acknowledge the Petitioner's guilt of the misdemeanor offenses in closing argument without consulting the Petitioner. The parties' briefs are limited to general assertions that counsel's conduct either did or did not constitute ineffective assistance. After reviewing the ample and accessible caselaw which guides our analysis of this specific claim, we conclude that while trial counsel was deficient in failing to consult with the Petitioner regarding a concession of guilt, the Petitioner has not demonstrated prejudice.

The Sixth Amendment to the United States Constitution guarantees a defendant "the Assistance of Counsel." In providing such assistance, trial counsel is charged with making decisions regarding trial management, such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *New York v. Hill*, 528 U.S. 110, 114-115 (2000) (citations omitted). Nevertheless, trial counsel, "'however expert, is still an assistant.'" *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018) (quoting *Faretta v. California*, 422 U.S. 806, 820 (1975)). Accordingly, "[s]ome decisions … are reserved for the client — notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *Id.* at 1508.

In *Florida v. Nixon*, the United States Supreme Court analyzed an attorney's decision to concede guilt in the trial phase of a death penalty case in order to preserve credibility in arguing for a lesser punishment. *Florida v. Nixon*, 543 U.S. 175, 178 (2004). Concluding that it was error for the lower courts to apply a presumption of prejudice, the Court analyzed the claim under the general principles of ineffective assistance of counsel. *Id.* at 178-79. In *Nixon*, trial counsel attempted to discuss the strategy of conceding guilt in the face of overwhelming evidence, but the defendant was unresponsive. *Id.* at 181. The Court observed that "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *Id.* at 187. These decisions, on which the defendant retains "'the ultimate authority,'" include "'whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.'" *Id.* (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). Accordingly, a mere "tacit acquiescence" in a guilty plea is insufficient because a guilty plea requires an explicit and affirmative consent. *Id.* at 187-88 (citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)).

However, the *Nixon* court made a distinction between entering a guilty plea and an argument in which counsel conceded guilt, because when guilt is conceded pursuant to closing argument, the prosecution remains "obliged to present during the guilt phase competent, admissible evidence establishing the essential elements of the crimes with

which [the defendant] was charged," and because the defense is able to cross-examine witnesses, exclude evidence, and perfect an appeal. *Id.* at 188. The Supreme Court concluded that it was error to presume that trial counsel's concession without the defendant's explicit permission was deficient or to apply a presumption of prejudice. *Id.* at 189. Because trial counsel's conduct was not the equivalent of a guilty plea and because trial counsel did not fail to subject the prosecution to meaningful adversarial testing, no presumption of prejudice would apply.[2] *Id.* at 190 (citing *United States v. Cronic*, 466 U.S. 648, 659 (1984)).

Accordingly, conceding guilt in argument is subject to a post-conviction analysis under *Strickland* when trial counsel has not failed to subject the State's case to meaningful adversarial testing and is not overriding the defendant's stated objective. *Id.* at 193; *see McCoy*, 138 S. Ct. at 1509. The record here demonstrates that the Petitioner had previously acknowledged guilt on the misdemeanor offenses. Ms. Armstrong and the victim both testified at trial that, during the hearing on the order of protection, the Petitioner agreed that he was guilty of assaulting the victim. *See Nicos Broadnax v. State*, No. W2018-01503-CCA-R3-PC, 2019 WL 1450399, at *5, 6 (Tenn. Crim. App. Mar. 29, 2019), *perm. app. denied* (Tenn. July 19, 2019) (noting, in the denial of post-conviction relief based on counsel's alleged failure to consult the defendant regarding conceding guilt, that the defendant had acknowledged his involvement in the offense to police). During the hearing on the order of protection, the allegations read into the record included the domestic assault allegations regarding the Petitioner's hitting the victim and assaulting her with a shoe and a sippy cup. While the Petitioner disputed that he acknowledged guilt, both the Petitioner and trial counsel testified that the Petitioner made no objection to trial counsel's closing argument and never contemporaneously complained regarding the strategy. *Nixon*, 543 U.S. at 185 (the objection to counsel's strategy was not raised until direct appeal); *see McCoy*, 138 S. Ct. at 1509 (distinguishing *Nixon* by noting that the defendant in *Nixon* "complained about the admission of his guilt only after trial"). The record instead shows that the Petitioner insisted on trial not because he asserted his innocence but because he believed that the victim would not come to court to testify.

However, the *Nixon* court's analysis is built upon the fundamental conclusion that trial counsel "undoubtedly" has the duty to consult with the defendant regarding overarching defense strategy and other important decisions. *Nixon*, 543 U.S. at 187.

---

[2] The Petitioner, whose direct appeal was decided prior to *McCoy*, does not raise a claim that his Sixth Amendment right to autonomy in his defense was violated. *See McCoy*, 138 S. Ct. at 1509-11 (holding that when a defendant adamantly opposed the strategy of conceding guilt, trial counsel had, by conceding guilt, violated the defendant's Sixth Amendment right to autonomy in his defense and had committed structural error not subject to harmless error review).

Trial counsel is "obliged to…explain his proposed trial strategy" to the defendant and "fulfill[] his duty of consultation by informing [the defendant] of counsel's proposed strategy and its potential benefits." *Id.* at 189. Counsel may only pursue a strategy of conceding guilt without explicit permission "when a defendant, *informed by counsel*, neither consents nor objects to the course counsel describes as the most promising means to avert a sentence of death." *Id.* at 178 (emphasis added); *see McCoy*, 138 S. Ct. at 1509 (concluding that trial counsel could not override the defendant's choice of defense "[i]f, *after consultations* with [trial counsel] concerning the management of the defense, [the defendant] disagreed" with the strategy (emphasis added)).

In the case at bar, trial counsel, by his own testimony, failed in this duty to consult the Petitioner. Trial counsel acknowledged at the post-conviction hearing that the Petitioner was seated next to him during the lengthy trial and that, despite having the opportunity to consult the Petitioner, he never proposed conceding guilt on the misdemeanor domestic assault offenses in an attempt to secure acquittal on the aggravated assault charges. Although trial counsel testified that the Petitioner refused to cooperate in his defense prior to trial, the testimony at the post-conviction hearing revealed that the Petitioner consulted with trial counsel as trial proceeded, providing him with information relevant to the cross-examination of witnesses. Accordingly, the Petitioner has demonstrated deficiency. *Compare Nicos Broadnax*, 2019 WL 1450399, at *6 (concluding that the post-conviction court implicitly discredited the petitioner's claim that he had not been consulted regarding the strategy of conceding guilt to a lesser included offense and that he had not acquiesced in the strategy).

In post-conviction, the burden is on the Petitioner to show that, but for trial counsel's deficiency, there is a reasonable probability that the outcome of the proceeding would have been different. Here, the Petitioner has not established prejudice from trial counsel's failure to consult him. First, despite the Petitioner's claim that he would have opposed the strategy, the record indicates that the Petitioner did not attempt to object to trial counsel's argument, and the Petitioner has not provided clear and convincing evidence that he would have opposed the strategy. When the Petitioner was asked if he refrained from objecting because he understood the strategy, he responded that he believed trial counsel was attempting to rectify trial counsel's mistake in advising him to reject the general sessions plea offer for the domestic assault. The logical inference is that the Petitioner understood that the strategy was to attempt to limit the convictions to the misdemeanor offenses. The Petitioner had previously acknowledged his guilt of domestic assault in a prior proceeding, and he agreed at the post-conviction hearing that he never voiced any objection to trial counsel's strategy of conceding guilt on the misdemeanor offenses in closing argument, not even when trial counsel met with him after trial to discuss his Rule 35 motion. Furthermore, the proof at trial was strong, and there was no question regarding the identity of the assailant. Trial counsel testified that

the victim was credible, and there was testimony from several witnesses, including the Petitioner's mother, that the victim bore bruises following the attack, as well as photographic evidence of her bruises and the hole made by the spindle in the dashboard. Trial counsel's strategy was successful in that the Petitioner was ultimately acquitted of one count of aggravated assault and convicted of a lesser included offense on another count. We conclude the Petitioner has not shown that the deficiency resulted in prejudice.

### IV. Failure to Object to Testimony of Prior Incarceration

The Petitioner asserts that trial counsel was ineffective in failing to object to the victim's testimony regarding the Petitioner's prior incarceration. We conclude that the Petitioner has failed to establish prejudice stemming from counsel's failure to object.

At trial, the victim gave testimony implying that the Petitioner had taken her vehicle while she was at a restaurant when she returned to town for a hearing on the order of protection. Trial counsel asked her whether the car had been a gift from the Petitioner's family, and she replied, "Actually, I want to say that I gave his mother, I think, they told me I could buy the car for $300, but it was my, pretty much gift for graduating beauty school while he was incarcerated." Trial counsel did not object to this testimony. At the post-conviction hearing, he stated that he did not "pick up" on the fact that she had referenced a prior period of incarceration.

The Petitioner argues that this was evidence of prior bad acts under Tennessee Rule of Evidence 404(b) and should not have been admissible. Regardless of the admissibility of the testimony, the Petitioner has not shown prejudice. Although trial counsel apparently did not "pick up" on the testimony and did not seek any relief, including a mistrial, the Petitioner must, in order to show prejudice, establish that such relief would have been granted. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006) (noting that a petitioner must show both that the failure to file a motion was deficient and that the deficiency resulted in prejudice), *abrogated on other grounds by Brown v. Jordan*, 563 S.W.3d 196, 202 (Tenn. 2018). Appellate courts have previously upheld a trial court's refusal to declare a mistrial after a passing reference to the defendant's prior imprisonment. *See, e.g.*, *State v. Bell*, 512 S.W.3d 167, 188 (Tenn. 2015) (concluding that the trial court did not err in not declaring a mistrial after two witnesses made brief and unsolicited references to the defendant's prior incarceration, the defendant refused a curative instruction, and the evidence implicating the defendant was strong); *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994) (concluding that the trial court did not err in refusing a mistrial when a witness referenced the defendant serving time in jail where the response was unsolicited, the court gave curative instructions, and the proof against the defendant was overwhelming); *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim.

App. 2007) (concluding that the trial court did not abuse its discretion in denying a mistrial for a reference to the defendant's incarceration when the reference was brief, was made in an attempt to explain a response, and the trial court had given curative instructions).

The statement here was not elicited by the State. *See Welcome*, 280 S.W.3d at 222 (listing factors the appellate court should evaluate in reviewing a trial court's decision on a motion for a mistrial). Although no curative instructions were requested, the State's proof was particularly strong. *Id.* The victim testified in detail about the abuse she suffered at the hands of the Petitioner, and her testimony was corroborated by physical evidence including photographs of her bruises, testimony from witnesses who saw her injuries, and the photograph of the damage to the dashboard of the car. The Petitioner has not established a reasonable probability that, had trial counsel sought relief based on the brief reference to his incarceration or moved for a mistrial, the outcome of the trial would have been different. He is not entitled to relief.

## V. Failure to Object to the Prosecutor's Comment on the Victim's Veracity

The Petitioner contends that trial counsel was ineffective because he did not object to a question which the Petitioner characterizes as a comment vouching for the victim's veracity. Because the prosecutor's question was not improper, trial counsel was not deficient in failing to object.

After trial counsel questioned the victim extensively about her attempt to reconcile with the Petitioner after the assault, the prosecutor asked the victim to confirm that the Petitioner was the father of her child and asked if she still "care[d] for him" in that role. The prosecutor then asked, "But you're testifying to the truth today, correct?" The victim answered in the affirmative.

It is improper for a prosecutor to give a personal opinion as to the truth or falsity of testimony. *State v. Sexton*, 368 S.W.3d 371, 420 (Tenn. 2012), *as corrected* (Tenn. Oct. 10, 2012) (citing *State v. Henley*, 774 S.W.2d 908, 911 (Tenn. 1989)). In this case, the Petitioner confuses giving a personal opinion with asking a question. The prosecutor asked the victim a question regarding whether her testimony was truthful. Had she answered that it was not, the prosecutor would have been bound by that testimony. The prosecutor herself expressed no opinion regarding whether the victim was being truthful. Accordingly, trial counsel had no basis to object, and his performance on this issue was not deficient.

## VI. Failure to Call Witnesses

The Petitioner asserts that trial counsel provided ineffective assistance by failing to call Mr. Partin or Ms. Thompson. Because the witnesses did not testify at the post-conviction hearing, the Petitioner is not entitled to relief.

The Petitioner contends that Mr. Partin and Ms. Thompson should have been called as witnesses to rebut the victim's testimony that she did not tell Mr. Partin and Ms. Thompson that she made allegations of abuse at Ms. Jones's behest. The post-conviction court denied relief because neither witness testified at the post-conviction hearing. When a claim of ineffective assistance of counsel is premised on counsel's failure to interview or call witnesses, the witnesses must be presented at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "'As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" *Pylant*, 263 S.W.3d at 869 (quoting *Black*, 794 S.W.2d at 757). This is because the court cannot speculate as to what a witness's testimony might have been. *Black*, 794 S.W.2d at 757. The Petitioner presented no proof that Mr. Partin or Ms. Thompson would have given favorable testimony. Accordingly, he has not demonstrated prejudice.

## VII. Failure to Interview Witnesses

The Petitioner alleges that trial counsel provided ineffective assistance by failing to interview certain witnesses. The State responds that the failure to interview was not deficient or prejudicial. We conclude that this argument is waived for failure to include argument and failure to raise the argument before the post-conviction court.

The Petitioner's brief refers to trial counsel's acknowledging "that he had not spoken to at least three of the State's witnesses prior to trial." The brief does not name these witnesses but includes citations to the record. We infer from the citations that the three witnesses are some combination of Mr. Pickett, Ms. Armstrong, Ms. Finney, and Officer Francis. The Petitioner's brief then asserts that "[o]ne will never know" if the outcome of trial was affected. Prejudice, however, requires showing a reasonable probability that the outcome was affected. We conclude that this issue is waived because the Petitioner has not included argument specifying the witnesses and has not alleged prejudice in his brief. *State v. Hester*, 324 S.W.3d 1, 80 (Tenn. 2010) ("A reviewing court may deem an issue waived when a party fails to develop an argument in support of its contention or merely constructs a skeletal argument."); *see* Tenn. Ct. Crim. App. R. 10(b) (noting that this court will treat as waived issues which are not supported by argument). We note parenthetically that the Petitioner has made no showing regarding

what information interviews with any of the witnesses would have uncovered and hence cannot establish prejudice.

Likewise, the failure to interview witnesses was never raised in the written post-conviction petitions. The post-conviction court addressed trial counsel's failure to call the witnesses who would allegedly have rebutted the testimony regarding bruising (Mr. Pickett and Officer Francis), but it never addressed trial counsel's failure to interview the witnesses because the issue was not raised below. "Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020). Accordingly, on this ground, as well, the issue is waived.

## CONCLUSION

Based on the foregoing analysis, we affirm the post-conviction court's judgment.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE